## RECORD NO. 14-1395

In The

# United States Court Of Appeals

### For The Fourth Circuit

## COVOL FUELS NO. 4, LLC,
## a Utah limited liability company,

*Plaintiff - Appellant,*

v.

## PINNACLE MINING COMPANY, LLC,
## a Delaware limited liability company,

*Defendant - Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY**

———————

**BRIEF OF APPELLEE**

———————

| | |
|---|---|
| **Wm. Scott Wickline** | **Joseph A. Castrodale** |
| **Christopher D. Pence** | **Timothy J. Downing** |
| **HARDY PENCE PLLC** | **Paul R. Harris** |
| **500 Lee Street, East, Suite 701** | **Matthew T. Wholey** |
| **Charleston, WV 25329** | **ULMER & BERNE LLP** |
| **(304) 345-7250** | **1660 West 2nd Street, Suite 1100** |
| **scott@hardypence.com** | **Cleveland, OH 44113** |
| **cpence@hardypence.com** | **(216) 583-7000** |
| | **jcastrodale@ulmer.com** |
| | **tdowning@ulmer.com** |
| | **pharris@ulmer.com** |
| | **mwholey@ulmer.com** |
| | |
| *Counsel for Appellee* | *Counsel for Appellee* |

# CORPORATE DISCLOSURE STATEMENT

REVISED CORPORATE DISCLOSURE FORM

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1395__    Caption: __Covol Fuels No. 4, LLC v. Pinnacle Mining Company, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Pinnacle Mining Company__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:
      Cliffs Natural Resources, Inc. (fourth tier parent)

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                 ☑ YES ☐ NO
      If yes, identify all such owners:
      Cliffs Natural Resources, Inc. (fourth tier parent)

10/28/2013 SCC                          - 1 -

REVISED CORPORATE DISCLOSURE FORM

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _____ July 7, 2014 _____

Counsel for: Pinnacle Mining Company

### CERTIFICATE OF SERVICE
***************************

I certify that on _____ July 7, 2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Alan L. Sullivan, Esq.                    Thomas V. Flaherty, Esq.
James D. Gardner, Esq.                    FLAHERTY, SENSABAUGH & BONASSO PLLC
Jeremy J. Stewart, Esq.                   200 Capitol Street
SNELL & WILMER, LLP                       Charleston, West Virginia 25301
15 West South Temple, Suite 1200
Salt Lake City, Utah 84101

_____                 _____ July 7, 2014 _____
      (signature)                                  (date)

- 2 -

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS.................................................................. iii

TABLE OF AUTHORITIES ...........................................................vi

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE.................................................................3

      Statement of the Facts..................................................................5

      A.    The Beginning of Covol's Coal Refuse Recovery Operation..............7

      B.    The Parties' Written Contracts ............................................9

      C.    Covol's Flawed Coal Refuse Recovery Plan ......................................10

      D.    Pinnacle's Compliance with Selenium Pollution Regulations............13

      E.    Pinnacle's Upgrades to its Wash Plant................................................15

      F.    Covol's Overburden Removal Project ................................................17

      G.    The End of Headwaters' Coal Cleaning Business .............................18

SUMMARY OF THE ARGUMENT ..................................................................20

      1.    Covol's Breach of Contract Claim......................................................20

      2.    Covol's Tort Claims .............................................................................23

ARGUMENT ...............................................................................................25

I.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO PINNACLE ON COVOL'S BREACH OF CONTRACT CLAIM ..................................................25

     A.   The District Court Correctly Held That the CPRRA is Unambiguous and Does Not Obligate Pinnacle to Lower the Water Level ........................................................................27

          1.   The District Court Correctly Held that the CPRRA is Unambiguous .............................................................27

          2.   The District Court Correctly Held that the CPRRA Does Not Obligate Pinnacle to Lower the Water in the Impoundment ..........................................................30

     B.   The District Court Correctly Held That the Parties' Permits Are Not Incorporated By Reference Through Section 8 of the CPRRA ..........................................................33

     C.   The District Court Correctly Declined to Create Any Implied Rights for Covol or to Impose Implied Obligations on Pinnacle ..........................................................38

     D.   The District Court Correctly Held that the Covenant of Good Faith and Fair Dealing Cannot Give Covol Rights That Are Inconsistent with the Plain Language of the CPRRA ..........................................................................41

II.  THE COURT PROPERLY GRANTED SUMMARY JUDGMENT TO PINNACLE ON COVOL'S TORT CLAIMS .......44

     A.   Covol's Tort Claims are Barred by the Gist of the Action Doctrine ........................................................................45

     B.   Covol's Tort Claims Are Deficient for Additional Reasons ........................................................................50

          1.   Covol Cannot Establish a Legal Duty to Disclose .........50

2.    Covol's Tort Claims Fail Because Covol Expressly Bases Those Claims on Statements of Future Intention and Because Covol Fails to Identify Any Specific Allegedly False Statement of Material Fact Made by Pinnacle or Evidence of Any Fraudulent Intent by Pinnacle ........................................51

3.    Covol's Tort Claims Fail Because Covol Did Not Rely Upon Any Alleged Misrepresentations .................54

CONCLUSION .......................................................................58

REQUEST FOR ORAL ARGUMENT ................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aventa Learning Inc v. K12, Inc.*,
    830 F. Supp. 2d 1083 (W.D. Wash. 2011) ...................................................42

*Bank of Montreal v. Signet Bank* ,
    193 F.3d 818 (4th Cir. 1999) ........................................................................54

*Barn-Chestnut, Inc. v. CFM Dev. Corp.*,
    457 S.E.2d 502 (W.Va. 1995) ...............................................................22, 41

*Berkeley County Public Service District v. Vitro Corporation of America*,
    162 S.E.2d 189 (1968) ...................................................................................28

*Boggs v. Camden-Clark Mem'l Hosp. Corp.*,
    693 S.E.2d 53 (2010) .....................................................................................28

*Browning v. Geupel Const. Co.*,
    891 F. Supp. 275 (S.D. W. Va. 1995) ..........................................................38

*Corder v. Countrywide Home Loans, Inc.*,
    No. 2:10–cv–0738, 2011 WL 289343 (S.D. W. Va. Jan. 26, 2011) ............41

*Core Commc'ns, Inc. v. Verizon Maryland LLC*,
    744 F.3d 310 (4th Cir. 2014) ........................................................................53

*Cotiga Dev. Co. v. United Fuel Gas Co.*,
    128 S.E.2d 626 (1962) ...................................................................................26

*Cranbrook Investors, Ltd. v. Great Atl. Mgmt*,
    201 F.3d 435, 1999 WL 0120534 (4th Cir. 1999)........................................30

*Doyle v. Fleetwood Homes of Va.*,
    650 F. Supp. 2d 535 (S.D. W.Va. 2009) ......................................................41

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ...........................................................................5

*Energy Development Corp. v. Moss*,
591 S.E.2d 135 (W. Va. 2003) ........................................................29

*Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*,
681 F. Supp. 2d 694 (S.D. W. Va. 2009) ........................................27

*Faith United Methodist Church and Cemetery of Terra Alta v. Morgan*,
745 S.E.2d 461 (W. Va. 2013) ........................................................28

*Far W. Fed. Bank, S.B. v. Office of Thrift Supervision-Dir.*,
119 F.3d 1358 (9th Cir. 1997) ........................................................44

*Fields v. Thompson Printing Co.*,
363 F.3d 259 (3d Cir. 2004) ...................................................42, 43

*Fifth Third Bank v. McClure Properties, Inc.*,
724 F. Supp. 2d 598 (S.D. W. Va. 2010) ...............................*passim*

*Fisher v. W. Virginia Coal & Transp. Co.*,
73 S.E.2d 633 (1952) .....................................................................40

*Folio v. City of Clarksburg*,
655 S.E.2d 143 (W. Va. 2007) ........................................................47

*Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP*,
746 S.E.2d 568 (W. Va. 2013) .................................................*passim*

*Gilberton Coal Co. v. Shuster*,
403 Pa. 226 (Pa. 1961)...........................................................26, 39

*Goodman v. Resolution Trust Corp.*,
7 F.3d 1123 (4th Cir. 1993) ...........................................................28

*Guin v. Ha*,
591 P.2d 1281 (Alaska 1979) ........................................................42

*Harris v. Reston Hosp. Center, LLC*,
  523 Fed. Appx. 938 (4th Cir. 2013) ......................................................46, 51

*Highmark W.Va. Inc. v. Jamie*,
  655 S.E.2d 509 (W. Va. 2007) ...................................................................41

*Kidd v. Mull*,
  215 W. Va. 151, 595 S.E.2d 308 (2004) ....................................................50

*King v. Island Creek Coal Co.*,
  339 F. Supp. 2d 735 (W.D. Va. 2004)........................................................38

*Kooleraire Serv. & installation Corp v. Bd of Ed. of City of New York*,
  28 N.Y.2d 101 (N.Y. Sup. Ct. 1971)..........................................................42

*Lucy v. Zehmer*,
  84 S.E.2d 516 (1954) ..................................................................................30

*Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 1
  991 F.2d 94 (4th Cir. 1992) .................................................................. 50-51

*McClure v. Elmo Greer & Sons of Kentucky, LLC*,
  369 F. Supp. 2d 832 (N.D. W. Va. 2005)...................................................45

*Nat'l Steel Erection, Inc. v. J.A. Jones Constr. Co.*,
  899 F. Supp. 268 (N.D. W. Va. 1995)..................................................45, 50

*Northrop Grumman Info. Tech., Inc. v. United States*,
  535 F.3d 1339 (Fed. Cir. 2008) .................................................................35

*Ohio Valley Envtl. Coal., Inc. v. Consol of Kentucky, Inc.*,
  Case No. 2:13-5005, 2014 WL 1761938 (S.D. W. Va. Apr. 30, 2014) ..........6

*Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*,
  602 F.3d 541 (3d Cir. 2010) .......................................................................48

*Perez v. Mountaire Farms, Inc.*,
  650 F.3d 350 (4th Cir. 2011) ................................................................5, 54

*Rollyson v. Jordan*,
    518 S.E.2d 372 (W. Va. 1999) ....................................................27

*Seremeth v. Bd. of Cty. Commrs. Frederick Cty.*,
    673 F.3d 333 (4th Cir. 2012) ......................................................51

*Shanks v. Wilson*,
    86 F. Supp. 789 (S.D. W. Va. 1949) ...........................................35

*Silk v. Flat Top. Constr., Inc.*,
    453 S.E.2d 356 (W. Va. 1994) ....................................................45

*Sinclair v. U.S.*,
    56 Fed. Cl. 270 (Fed. Cl. 2003) ..................................................44

*Star v. Rosenthal*,
    884 F. Supp. 2d 319 (E.D. Pa. 2012)...........................................47

*State ex rel. U-Haul Co. of West Virginia v. Zakaib*,
    752 S.E.2d 586 (W. Va. 2013) .......................................21, 34, 36

*Std. Aero, Inc. v. McDonough*,
    1 F.3d 1234 (4th Cir. 1993) ........................................................51

*Story v. City of Bozeman*,
    242 Mont. 436 (1990) ................................................................42

*Sunoco, Inc. (R&M) v. Toledo Edison Co.*,
    953 N.E.2d 285 (Ohio 2011) ......................................................29

*Tully v. Tolley*,
    63 Fed App'x 108 (4th Cir. 2003) .........................................50, 53

*United States v. Colton*,
    231 F.3d 890 (4th Cir. 2000) ......................................................51

*United States v. Gray*,
    405 F.3d 227 (4th Cir. 2005) ......................................................51

*Vives v. Rodriguez*,
849 F. Supp. 2d 507 (E.D. Pa. 2012).........................................................47, 48

*White v. Nat'l Steel Corp.*,
938 F.2d 474 (4th Cir. 1991) .......................................................52

*Wood v. Acordia*,
618 S.E.2d 415 (2005) ................................................28

## Statutes

30 U.S.C. § 801(g) ................................................................37

Internal Revenue Code § 45 .........................................................8

## Regulations

30 C.F.R. § 77.216, *et. seq.*...........................................................11

30 C.F.R. § 77.216 ................................................................12

30 C.F.R. § 77.216-2 ................................................................12

30 C.F.R. § 7.216–2(a)(17) .......................................................53

W.Va. 38 C.S.R. § 2...............................................................11

## Rule

Fed. R. App. P. 28(a)(8)(A) .......................................................5

## Other Authorities

23 Williston on Contracts § 63:1 ................................................27

MSHA Engineering and Design Manual Coal Refuse Disposal Facilities,
§ 3.6, *available at* http://www.msha.gov/Impoundments/DesignManual/
ImpoundmentDesignManual.asp ................................................12, 37, 38

x

Restatement (Second) of Contracts § 265 ................................................ 44

Williston on Contracts § 30:4 (2012) ...................................................... 39

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

Covol's statement of the issues presented for review misstates and misrepresents the holdings of the District Court.  Pinnacle submits that Covol's appeal presents the following issues for review:

1.     Whether the District Court properly held that the Coal Purchase and Refuse Recovery Agreement (the "CPRRA") imposed no express or implied obligation on Pinnacle to lower the water level in the impoundment pond and that, in any case, there are insufficient facts to support Covol's breach of contract claim.

2.     Whether the District Court properly held that the rights and obligations within the CPRRA are limited to its freely-negotiated terms and correctly rejected Covol's attempt to impose an implied duty on Pinnacle to lower the water level where such a duty is not supported by and would run contrary to the express language of the CPRRA.

3.     Whether the District Court properly rejected Covol's attempt to use the covenant of good faith and fair dealing to obtain rights that are inconsistent with those set forth in the CPRRA.

4.     Whether the District Court properly held that Covol's fraudulent concealment and negligent misrepresentation claims are barred by West

1

Virginia's gist of the action doctrine because those claims would not arise

independent of the CPRRA.

5.    Whether the District Court correctly granted summary judgment to Pinnacle

on Covol's fraudulent concealment and negligent misrepresentation claims

given that Covol could not set forth sufficient facts to create a genuine issue

of material fact as to crucial elements of the claims.

## STATEMENT OF THE CASE

As the District Court explained, this "dispute arises from a strategic business alliance between [Pinnacle and Covol]. . . . From 2008 until 2012, the parties operated under a contract providing for Covol to process the coal waste material from Pinnacle's mining operation in Wyoming County, West Virginia, into saleable coal." [Order at 1[JA2861-62]].

Under the parties' Coal Purchase and Refuse Recovery Agreement (the "CPRRA"[JA75-92]), Covol sought to dredge an impoundment pond connected to Pinnacle's active underground mining operations, into which Pinnacle and its predecessors discharged refuse from mining operations for decades (the "Impoundment"). The CPRRA dictates the parties' duties and obligations, including Covol's agreement not to interfere with Pinnacle's operations and Pinnacle's express disclaimers of any warranty as to (1) the "character or quality or amount" of the refuse material in the Impoundment and (2) the suitability of the Impoundment for Covol's operation.

Covol's method of recovering coal from the Impoundment, which relied on a dredge with a twenty-five foot mechanical arm, proved to be unsuccessful. Covol's chosen method was unsuitable in the Impoundment given the limitations of the Impoundment itself and the limits set on the parties' operations by the safety and environmental regulations of the Mine Safety and

3

Health Administration ("MSHA") and the West Virginia Department of Environmental Protection ("WVDEP"). In August of 2012, Covol sued Pinnacle, attempting to blame Pinnacle for the failure of its coal refuse recovery strategy and asserting four claims in its Complaint: (1) breach of contract, based on the CPRRA; (2) fraudulent concealment; (3) negligent misrepresentation; and (4) unjust enrichment. [Compl.[JA16-29]].

On April 9, 2014, the District Court, in a thirty-page Memorandum Opinion and Order, granted summary judgment to Pinnacle on all four counts asserted in Covol's Complaint (the "Order" [JA2861-91]). The District Court held: (1) Covol's contract claim failed because the CPRRA is unambiguous and does not obligate Pinnacle to lower the water level in the Impoundment for Covol and because, in any event, Covol *was never denied access* to the refuse material in the Impoundment; (2) Covol's tort claims were not supported by the evidence and were barred by the gist of the action doctrine because they would not arise independent of the CPRRA; and, (3) Covol's unjust enrichment claim had no merit because it too would not arise independent of the CPRRA.

4

In this appeal, Covol seeks review of the first and second holdings of the District Court.  Covol has not sought review of the District Court's ruling on its unjust enrichment claim.[1]

### Statement of the Facts

Covol's Statement of the Facts contains several critical errors and omissions.

*First*, Covol's discussion of the CPRRA never mentions Section 20 of the CPRRA, in which Pinnacle expressly disclaimed any representation or warranty as to: (1) "the character or quality or amount of the [r]efuse [m]aterial" in the Impoundment, and as to (2) "the suitability or safety of Pinnacle's property for the processing of the [m]aterial as contemplated" by the CPRRA.  Also in Section 20, Covol expressly "accept[ed] the risks" associated with the "suitability" of Pinnacle's property for Covol's coal refuse recovery operation.  [*Id.*].  Covol's breach of contract claim, which asserts that the CPRRA obligated Pinnacle to lower the water level in the Impoundment in order to make Covol's refuse recovery operation easier (*i.e.*, render the Impoundment more suitable for Covol's operation), is barred by Section 20 of the CPRRA, among other provisions.

---

[1] Covol has not mentioned the unjust enrichment claim in its docketing statement or anywhere in its opening brief.  As a result, Covol has waived any appeal from the District Court's ruling granting summary judgment to Pinnacle on its unjust enrichment claim. Fed. R. App. P. 28(a)(8)(A); *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 372 n.13 (4th Cir. 2011).

*Second*, Covol's discussion of Pinnacle's efforts to comply with selenium pollution regulations omits several key facts. Pinnacle involved Covol in its evaluation of the selenium issue, going so far as to share its consultants' report and recommendations with Covol and considering Covol's comments on Pinnacle's plans. (Turner 292:6-293:18[JA1109-10]; Rau 152:13-153:13[JA1454-55]). Further, Covol fails to acknowledge that the water management plan implemented by Pinnacle successfully reduced selenium levels below the level mandated by the WVDEP. (Townsend 91[JA949]; Rau 155-156[JA762-63]).[2] And while Covol maintains that Pinnacle should have chosen a water treatment plan instead of its water management plan, Covol fails to acknowledge that there is no evidence in the record to suggest that such a treatment plan would have been successful had it been implemented at the Pinnacle Mine. (*See* Rau 156-157[JA763-64]). Moreover, Covol never mentions that Pinnacle's implementation of the water management plan in 2010 came as a result of an enforcement action brought by the WVDEP – *i.e.*, Covol fails to acknowledge that Pinnacle had to take action in 2010 to ensure compliance with selenium regulations. (*E.g.,* Townsend

---

[2] The success of Pinnacle's selenium management plan was no mean feat. As other coal companies have learned over the past several years, achieving compliance can be daunting and expensive, and a company's failure to comply may subject it to significant liability. *See Ohio Valley Envtl. Coal., Inc. v. Consol of Kentucky, Inc.*, Case No. 2:13-5005, 2014 WL 1761938, *18 (S.D. W. Va. Apr. 30, 2014) (order finding coal company liable for failure to adhere to the selenium outfall regulations at issue in this case).

119:24-122:19[JA953-56]; Townsend Declaration ¶3[JA1271]; *id.* Ex. 1[JA1272-79]).  Pinnacle had no choice but to adopt a selenium management plan that, in the company's best judgment, would be effective.

*Third*, Covol repeatedly states in its brief that Pinnacle both promised to lower the water level in the Impoundment and later refused to do so.  Neither statement is supported by the record, and, fatal to Covol's case, no such promise appears in the fully-integrated CPRRA.  Pinnacle never refused to lower the water level in the Impoundment; instead, Pinnacle tried but was at times unable to do so due to limitations on its ability to pump water out of the Impoundment ***both before and after the selenium issue arose***.  (Turner 267[JA1538]; O'Bryan 163-167[JA2280-84]; Palmer 129[JA2300]; 160-164[JA678-82]; Def. Ex. 4K[JA715-19]).  Pinnacle also never agreed, in the CPRRA or otherwise, to be obliged to lower the water level at Covol's demand. (O'Bryan 163-67[JA2280-84]; 192[JA2287]).

Pinnacle also submits the following statement to better explain the parties' dealings:

## A. <u>The Beginning of Covol's Coal Refuse Recovery Operation</u>

Covol's parent companies, Headwaters Incorporated and Headwaters Energy Services Corp. (collectively, "Headwaters"), [*see* [JA3]], began acquiring coal cleaning facilities in 2006, hoping to take advantage of tax credits available

under Internal Revenue Code §45. (Turner 36:25-38:10[JA1086-88]; Shaal 47:23-48:22[JA851-52]). Over the course of a two-year period, Headwaters, which is primarily a building products company, purchased eleven such facilities across the country and set out to place the facilities in service by December 31, 2008, a critical deadline for Section 45 tax credits. (Turner 36:25-38:10[JA1086-88]).[3] One of those facilities was the facility at issue here, which is located at the Pinnacle Mine and was designed to recover coal fines from refuse resulting from Pinnacle's mining operations (the "Processing Facility").

Headwaters' due diligence on the Processing Facility showed that the previous operator had performed poorly; indeed, Covol knew at the time of closing that one of the Processing Facility's former owners believed the operation had "zero value." (Turner 66:1-9[JA1089], 90-91[JA1090-91], Df. Ex. 8A[JA1176-83]). Before its purchase, Headwaters hired a third-party appraiser that valued the facility at approximately $9.8 million, (Turner 106:3-17[JA1095]; *id.* 98:15-99:10[JA1093-94]; Df. Ex. 8B[JA1184-1234]), and Headwaters' employees valued the operation at less than $10 million. (Risher 143:14-17[JA835], 254:17-255:1[JA838-39]). Moreover, Headwaters learned that there was a limited amount of refuse material available for processing at the time. (Cartier 34-39[JA380-85], 52-53[JA386-87], 93-96[JA393-96]; Df. Exs. 1C[JA416-19], 1H[JA427-28]).

---

[3] *See also* Shaal 47:23-48:22[JA851-52]; Benson 111:4-23[JA345], 140:3-13[JA349]; Gehrmann 203:20-205:4[JA509-11].

Despite those due diligence conclusions, in February 2008, Headwaters decided to purchase the Processing Facility for approximately $14 million because it believed there was significant upside. (Benson 83:24-84:8[JA340-41]; Turner 91:22-25[JA1091]). Further, Covol understood when it entered into the contracts that its "plant [would not] run without [an] upgrade," which was projected to cost an additional $4 million. (Risher 178:2-179:11[JA836-37], Df. Ex. 7I[JA840-43]).

## B. **The Parties' Written Contracts**

In February of 2008, Covol entered into several agreements with Pinnacle and certain corporate affiliates. Principal among those agreements is the CPRRA, a fully-integrated contract that governs all of Covol's claims in this case. (Compl. ¶37[JA24]; CPRRA, §28).[4]

Given that Covol would be operating on Pinnnacle's property while Pinnacle ran its own mining operations, Pinnacle granted Covol defined rights of access on the property, set forth in Section 18 of the CPRRA. The limited nature of those rights was an important aspect of the CPRRA because the Impoundment is a key component of Pinnacle's coal mining operation; in fact, the Impoundment's "primary purpose is to hold" the refuse "from [the] Pinnacle [Wash P]lant." (O'Bryan 31:10-114[JA629]).

---

[4] The District Court's Opinion sets forth at pages 2-3 the provisions most relevant to this dispute[JA2862-63].

9

Critically, Covol agreed to "conduct its activities" under the CPRRA "in such a way" that would "not interfere with Pinnacle's Mining Operations." [5] Further, Pinnacle expressly disclaimed any representation or warranty regarding the quality or quantity of the refuse material or the suitability of its property for Covol's operations, and Covol, likewise, agreed to "accept the risks associated with the . . . suitability" of the Impoundment for its operation. Moreover, if Covol "reasonably determine[d] that it is not economically feasible to continue to purchase and process the Refuse Material," Covol could unilaterally terminate the CPRRA upon 90 days' notice.  (*Id.*, §12[JA81]).

## C. <u>Covol's Flawed Coal Refuse Recovery Plan</u>

After Pinnacle severs coal from the earth and brings it to the surface, it washes it at its coal preparation plant (the "Wash Plant"). The Wash Plant expels waste material, including "slurry," which is a combination of water, clay, and fine coal particles that were not recovered at the Wash Plant.  The slurry is dumped into the Impoundment, which is up to 200-feet deep at its deepest (including the refuse material) and almost a mile in length, with widths varying from 500 – 1000 feet. (O'Bryan 31:10[JA629]).

---

[5] *See also* CPRRA §10 ("… Covol shall conduct all of its operations hereunder in such manner as to reasonably do the least possible damage to Pinnacle's premises or to the property of any other person.").

10

In order to recover and process the refuse material, Covol used a dredge with a mechanical arm that dipped into the Impoundment and dragged the refuse material out of the water. (Palmer 63-64[JA666-67]). Covol chose to use a dredge with an arm that was only 25-feet long, even though longer arms (*e.g.*, 75-foot and 100-foot arms) were available. (Palmer 63:20-64:5[JA666-67], 111:16-19[JA669]).[6]

When Covol began operating in 2008, only a small portion of the Impoundment could be dredged due to limits under existing regulations on how close the dredge could mine near the edges of the Impoundment. (30 CFR §77.216, *et. seq.*, W. Va. 38 C.S.R. §2).[7] Covol decided to remove mining spoils that formed a slope on one side of the Impoundment (the "Overburden Removal Project") in order to recover more refuse material.[8] (*E.g.*, Turner 304:4-10[JA1111]; 257:5-258:17[JA1104-05]; Df. Ex. 8Q[JA1235-37]).

The Overburden Removal Project required approval from MSHA because Covol wanted to mine in close proximity to one edge of the Impoundment

---

[6] *See also* Turner 326:10-327:20[JA1118-19], 336:11-337:2[JA1122-23]; Shaal 135:18-25[JA857]; Greenwald 50:25-51:13[JA535-36]; Ballard 302:20-305:25[JA164-67], Df. Ex. 6R[JA307].

[7] *See* Greenwald 95:15-98:4[JA538-41]; Df. Ex. 2G[JA549-54]; Cartier 194-195[JA412-13]; Townsend 24:22-25:9[JA932-33]; Rau 56:23-60:20[JA731-35]; Df. Ex. 9R[JA765-66]; Shaal 115:3-8[JA855].

[8] Covol refers to the Overburden Removal Project as "recontouring" in its Complaint, and at times witnesses have referred to it as the "spoil removal project."

11

that was comprised of "unconsolidated material" and thus was subject to an "extra safety margin" under the existing MSHA plan.[9]  Covol prepared a revised plan, which Pinnacle submitted to MSHA on Covol's behalf, that would follow the removal of the "unconsolidated material."  Under that plan, Covol sought to mine the refuse material in six 25-foot "lifts," not coincidentally the same length as its dredge arm (the "Six-Phase Plan"). Covol's plan anticipated that the water in the Impoundment would be lowered by 25 feet after each lift, even though the plan did not explain or specify how the water would be lowered. (*See* Rau 74:7-77:25[JA736-39]; Df. Ex. 9S[JA767-72]).    Further, Covol's subsequent submissions to MSHA regarding the Plan stated that "***Covol*** will lower the pool level in the [I]mpoundment . . . " (JA2426; JA 2408-2427).  (emphasis added).

Lowering the water to the extent contemplated under the Six-Phase Plan, however, would require years of pumping, assuming that Covol's plan was to rely entirely on Pinnacle's ability to lower the water level in the Impoundment. (O'Bryan 164:4-5[JA644]).  Indeed, Pinnacle's ability to pump water out of the Impoundment was quite limited, both before and after Covol started operating in the Impoundment.  (*See* O'Bryan 162-167[JA642-47]; Palmer 160-164[678-82]). Pinnacle had two pumps, which together could pump out 3,000 gallons per minute;

---

[9] *See* 30 CFR §77.216; 30 CFR §77.216-2; MSHA Engineering and Design Manual Coal Refuse Disposal Facilities, §3.6, *available at* http://www.msha.gov/Impoundments/DesignManual/ImpoundmentDesignManual. asp

that meant, in a pond the size of the Impoundment, that Pinnacle was able to lower the water level around an "inch a week." (O'Bryan 164:4-22[JA644]).[10]

Pinnacle could only do so much with respect to water levels because, among other reasons, Pinnacle could not control the impact of rainfall. (Palmer 160:19-161:11[JA678-79]). Rainfall, the constant inflow of slurry from the Pinnacle plant, and waste from Covol's own Processing Facility limited Pinnacle's ability to adjust the water level at Covol's demand. (O'Bryan 152:16-24[JA641]). This situation was always known to Covol, as admitted by its plant manager. (*See* Palmer 127:10-127:16[JA673], 161-64[JA679-82]; Df. Ex. 4K[JA715-19).

Despite these known limitations, Covol submitted its Six-Phase Plan to MSHA, through Pinnacle as the permittee, in late 2008.[11] (Cartier 142:6-145:15[JA407-10], Df. Exs. 1R[JA430-32], 1S[JA433-36]; Townsend 30:16-31:13[JA938-39], Pl. Ex. 34[JA1067-69]; *see also* Palmer 63:16-22[JA666]).

### D. <u>Pinnacle's Compliance with Selenium Pollution Regulations</u>

In 2010, Pinnacle faced a WVDEP enforcement action in which it was forced to address a near-universal problem for coal companies in West Virginia:

---

[10] While Covol's complaints in this lawsuit focus on lowering the water level, there were times when Covol asked for the water level to be *raised*. (O'Bryan 177:15-21[JA648]; Palmer 154:1-18[JA677]; Df. Ex. 4G[JA713-14]).

[11] Pinnacle, as the owner of the property, held certain permits that were necessary for the mining operations taking place on the property. (Cartier 89:16-25[JA392]; Rau 32:20-33:25[JA1445-46]; Townsend 30(b)(6) 11:6-13:23[JA869-71]; Townsend 21:13-23:20[JA1476-78]).

selenium pollution.[12]   Pinnacle sought guidance from experts on the selenium problem and engaged Covol in those discussions. (Turner 292:6-293:18[JA1109-10]; Townsend 128:1-7[JA957]; Combs 43:4-44:17[JA450-51]).

Ultimately, after consulting with experts at Barr Engineering, Pinnacle selected a water recycling program in August 2010 that processed the selenium-contaminated water through the Impoundment and an underground reservoir. (Townsend 79:20-80:10[JA940-41]; Pl. Ex. 33[JA961-1066]).   Barr's report concluded that such a water management program was the best option for Pinnacle because Pinnacle's underground "reservoir has an apparent natural buffering capacity against high selenium concentration inflow."  (Pl. Ex. 33 at 21[JA988]).[13] The water management system implemented by Pinnacle was successful: it reduced the selenium content below the WVDEP-mandated level.   (Townsend 91[JA949]; Rau 155-156[JA762-63]).

Although nothing in the CPRRA obligated Pinnacle to do so, Pinnacle shared Barr's report and recommendations with Covol.   (Turner 292:6-293:18[JA1109-10]; Rau 152:13-153:13[JA759-60]; Df. Ex. 10E[JA813-18]). Darrell Turner, the main architect of Covol's coal recovery operations,

---

[12] Townsend 119:24-122:19[JA953-56]; Pl. Exs. 49[JA1070-76], 53[JA1077]; Rau 140:18-141:5[JA2325-26],       142:13-15[JA2327];       Townsend       Declaration ¶3[JA1271]; *id.* Ex. 1[JA1272-79].
[13] Barr also concluded that "passive microbial treatment" was of uncertain value. [JA989].

acknowledged that Pinnacle kept him informed of its decision-making regarding selenium management. (Turner 292:23-293:5[JA1109-10]). Mr. Turner also reported to Headwaters' upper management that he had met with Pinnacle representatives regarding the selenium issue before Barr's recommendations went into effect. (Df. Ex. 8T[JA1238-39]; Gehrmann 89:9-90:13[JA494-95]).[14]

### E. Pinnacle's Upgrades to its Wash Plant

In late 2010, Pinnacle began making changes to its Wash Plant to achieve greater efficiency in its operations. (Turner 292:6-293:18[JA1109-10]; Df. Ex. 8T[JA1238-39]). Pinnacle's Wash Plant was outdated and did not recover

---

[14] Covol's witnesses also explained that they internally discussed the selenium problem, engaged employees to analyze the issue, and reported the selenium threat to the Headwaters Board of Directors as early as September 2010. (Gehrmann 190:14-191:16[JA507-08], 162:12-22[JA501], 167:6-9[JA502]; Df. Ex. 11C[JA521-30]; Rau. 156:13-157:25[JA763-64]). Importantly, it was Pinnacle's responsibility, under the terms of the CPRRA, to ensure compliance with environmental laws and obligations. (CPRRA, §§7, 8, 23[JA78-80, 88]). Covol argues that Pinnacle "reject[ed] a treatment option" for addressing its obligations regarding selenium, apparently claiming that Pinnacle could only select a selenium management plan that would have no detrimental effect on Covol's operations. (Opp. at 19[JA1304]). The treatment option that Covol suggests Pinnacle should have selected was never a viable option. One witness testified that, given "the volumes" of water at issue at the Pinnacle Mine, it "would take a facility the size of West Virginia" to adequately treat the selenium in Pinnacle's water system. (Dangerfield Dep. 181-184[JA2172-75]. Covol's witnesses could not identify any viable treatment options for a facility on the scale of the Pinnacle Mine. (Gehrmann 167-168[JA2219-20]; Greenwald 252-253[JA2261-62]; Palmer 131[JA676]). Indeed, Covol has not introduced any evidence that any such treatment option had in fact been implemented and worked at any site, let alone a site comparable to the Pinnacle Mine.

carbon from raw coal at the rate of modern wash plants.[15]   In other words, Pinnacle was "throwing away a lot of coal." (Palmer 242:11[JA698]).   After Pinnacle completed the upgrades to the Wash Plant in 2011, the Wash Plant began recovering more carbon and expelled slurry containing less coal and more ash. (O'Bryan 124-125[JA1414-15]).

        Nothing in the contracts prevented Pinnacle from upgrading its Wash Plant. To the contrary, Sections 4 and 20 support Pinnacle's right to conduct its operations as it sees fit.   In addition, nothing in the contracts obligated Pinnacle to inform Covol of Pinnacle's intent to upgrade its Wash Plant or otherwise improve its mining operations.  Pinnacle nonetheless informed Covol of its plans to upgrade the Wash Plant.

        Darrell Turner admitted that he met with Pinnacle representatives in July 2010 to discuss, among other things, the planned upgrade, and Mr. Turner knew then that the results of that upgrade would decrease Covol's "desire to process" the slurry that would be added after the upgrades were complete. (Turner 292:6-293:18[JA1109-10];  Df. Ex.  8T[JA1238-39];  Combs  58:14-59:18[JA452-53]). Existing coal fines in the Impoundment would of course remain available for processing.   That same day, Mr. Turner reported Pinnacle's planned Wash Plant

---

[15] Palmer 16-17[JA660-61], 242:11[JA698]; O'Bryan 124:21-23[JA1414].

upgrade to the President of Headwaters' coal division. (Gehrmann 175:22-25[JA505]; Df. Ex. 10X[JA519-20]).

After the upgrade was complete, Covol complained about the placement of slurry at the front of the Impoundment, which is where the slurry had been placed for "30 plus years." (Shaal 27:10-22[JA850]; Palmer 245:24-246:4[JA699-700]). Pinnacle, again despite having no obligation to do so, responded to those complaints and worked with Covol to develop a pipeline system to pump the slurry to the back of the Impoundment instead. (O'Bryan 196:20-198:16[JA649-51]; Palmer 251[JA702]). Covol, however, abandoned that proposed system and shut down its operations in July 2012. (O'Bryan 214:20-215:11[JA652-53]; Palmer 251-52[JA702-03], 266-67[JA704-05]).

## F. Covol's Overburden Removal Project

MSHA did not approve Covol's Six-Phase Plan, which Covol claims obligated Pinnacle to lower water levels on demand, until August 2010, and the WVDEP approved only the first two phases. (Townsend 30:16-31:13[JA938-39], Pl. Ex. 34[JA1067-69]; Rau 79:17-80:6[JA740-41], 94:6-95:12[JA742-43], Df. Ex. 9X[JA773]). Thereafter, Covol began its Overburden Removal Project and completed it in 2011. (Palmer 223:7-225:13[JA688-90]; Df. Ex. 4X[JA720-22]). Covol spent approximately $4 million on the project. (Gehrmann 82:4-22[JA487]).

17

When the Overburden Removal Project was nearly complete, Covol attempted to negotiate an agreement with Pinnacle to pay for half of the project and prepared a proposed amendment to the CSA. (Turner 318-320[JA1112-14]; Df. Ex. 8W[JA1240-49]).  Pinnacle rejected the proposal, and no amendment to the fully integrated CSA was ever executed.  (Turner 320-23[JA1114-17]; Df. Ex. 8X[JA1250-51]; Vetor 75-83[JA1262-70]).

### G. The End of Headwaters' Coal Cleaning Business

Ultimately, Covol says, Covol found itself unable to economically process the refuse material from the Impoundment.  In reality, Headwaters' entire coal cleaning division turned out to be a bad investment, as acknowledged by its CEO.  (Benson 110:2-8[JA344]; Ballard 326:12-16[JA173]).[16]

In 2011, the Headwaters Board of Directors authorized the sale of the facilities and pursued potential buyers. (Benson 135:11-16[JA348]; Gehrmann 214:11-216:4[JA512-14]).  By early 2013, Headwaters had sold the assets of 10 of

---

[16] Mr. Benson supported the sale of the coal cleaning division so that Headwaters, a building products company, could "simplify the story . . . to the marketplace." (Benson 140-41[JA349-50]; 111:4-23[JA345]; Gehrmann 203-05[JA509-11]). In truth, all of their refuse recovery facilities performed so poorly in their first three years that Headwaters reduced the book value of its coal cleaning assets from $122.3 million in March 2010 to $13.5 million in September 2011. (Ballard 88:1-5[JA153], 217:9-18[JA154]; 244-46[JA155-57]; Df. Exs. 5H[JA174], 6B[JA175-85], 6H[JA186-306]). Furthermore, Covol considered selling the facilities as early as August or September of 2009, just a year and a half after buying the Processing Facility. (Shaal 117:6-13[JA856]; Turner 182:8-183:12[JA1100-01]; Pl. Ex. 3[JA1136-57]).

the facilities (including Covol) to Bowie Refined Coal, LLC ("Bowie") and sold

the 11th facility to another buyer.  (Benson 30(b)(6) 56:10-58:11[JA319-21]; Df.

Ex. 9P[JA322-33]). [17]

---

[17] Notably, when Headwaters sold Covol's assets to Bowie, it represented and
warranted that Pinnacle was not in breach of the CPRRA. (Benson 30(b)(6) 49:3-
17[JA2900];  50:17-51:16[JA2901-02];  Df.  Exs.  6M[JA2903-85],  9O[JA2986-
3083].)    Mr.  Benson,  Headwaters'  CEO  and  designated  Rule  30(b)(6)
representative, acknowledged at his deposition that Headwaters had sold Covol and
its assets as part of a "$60 million" deal, of which amount $10.8 million was
attributable  to  the  sale  of  the  Processing  Facility.  (Benson  30(b)(6)  54:25-
55:8[JA317-18]).

## SUMMARY OF THE ARGUMENT

### 1.    Covol's Breach of Contract Claim.

The District Court correctly held that Covol's breach of contract claim fails as a matter of law because Covol cannot establish that Pinnacle breached any of its obligations under the parties' fully-integrated contract, the CPRRA.  The District Court first correctly found that "the language of the CPRRA is clear and unambiguous.  The terms are straightforward, understandable and definitive.  They are not susceptible to more than one reasonable interpretation."  (Order at 15[JA2875]).[18]  Therefore, the Court properly "identif[ied] and enforce[d] the plain and natural meaning of the language of the CPRRA," and held that Pinnacle did not breach any express obligation that it owed to Covol under the CPRRA.  (*Id.*; *see also id.* at 19[JA2879]).

The District Court correctly held that the CPRRA does not impose any express or implied obligation on Pinnacle to lower the water level in the Impoundment.  (Order at 17[JA2877]).  The District Court properly rejected Covol's invitation to "impose an additional duty or right that is not expressed in the plain language of the contract" – *i.e.*, Covol's purported right to demand that Pinnacle "affirmatively lower the water level."  *Id.*  (citing *Fifth Third Bank v. McClure Properties, Inc.*, 724 F. Supp. 2d 598, 605 (S.D. W. Va. 2010)).  And, in

---

[18] Covol, for its part, has failed to identify any language in the CPRRA that it believes is ambiguous, either before the District Court or on appeal.

addition, the District Court correctly held that, even assuming Covol had the right to access the refuse material, Pinnacle did not, as a factual matter, breach the CPRRA simply by making operational changes that may have made Covol's operation more difficult.

The District Court also properly rejected Covol's attempt to incorporate by reference the parties' MSHA plans and WVDEP permits via Section 8 of the CPRRA. As the District Court explained, "a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement." *Id.* at 18 [JA2878](quoting *State ex rel. U-Haul Co. of West Virginia v. Zakaib*, 752 S.E.2d 586, 598 (W. Va. 2013)). Here, the "language in the CPRRA regarding [the parties'] mining plans and permits is nothing more than an 'oblique reference to a separate, non-contemporaneous document' and, as such, is insufficient" to incorporate the permits into the parties' agreement. *Id.* (quoting *U-Haul*, 752 S.E.2d at 595). Moreover, while the MSHA plans and WVDEP permits in place have specific identifying numbers, those numbers are not referenced in the CPRRA. In addition, the CPRRA contains no express language of incorporation that could purport to make those plans and permits part of the CPRRA.

The District Court next correctly held that Covol's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law. The

court first found that "no genuine dispute of material fact" exists "concerning whether Pinnacle met the standard of reasonable fair dealing when managing the selenium pollution issue." *Id.* at 22[JA2882]. Even more importantly, the District Court properly held that "the implied covenant of good faith and fair dealing 'cannot give contracting parties rights which are inconsistent with those set out in the contract.'" *Id.* (quoting *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 457 S.E.2d 502, 509 (W. Va. 1995)).

Here, Covol's claim that Pinnacle violated the implied covenant of good faith and fair dealing, based on the fact that Pinnacle's "business decisions" in response to the selenium pollution problem meant that Covol "had to deal with more water in the impoundment," (Order at 20[JA2880]), runs contrary to the terms of Section 20 of the CPRRA. Section 20 "explicitly disclaims any warranty regarding the . . . suitability of [Pinnacle's] property for the operation of Covol's coal refuse recovery operation." (Order at 20-21[JA2880-81]). Covol cannot use the covenant of good faith and fair dealing to impose an obligation on Pinnacle to lower the water level in the Impoundment because such an obligation would be inconsistent with Pinnacle's express disclaimer in Section 20 of the CPRRA and with the express limitation on Covol in Section 4 that its operation could not interfere with Pinnacle's coal mining operation, which was the dominant operation on the property.

## 2.    Covol's Tort Claims.

The District Court also properly granted summary judgment on Covol's tort claims.  First, Covol's claims are barred by the West Virginia gist of the action doctrine because all of the parties' obligations are defined by the terms of the CPRRA.  *See Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 577 (W. Va. 2013).  Covol's claim before this Court is that its tort claims are "alternative claims" that, it says, can proceed to a jury only if this Court finds that the CPRRA does not impose any obligation on Pinnacle to lower the water level in the Impoundment.  That is precisely the kind of claim that the gist of the action doctrine prohibits.

In addition, Covol's tort claims are not supported by the record.  Covol cannot establish that Pinnacle actively concealed or negligently misrepresented any material facts .  Instead, the record demonstrates that Pinnacle informed Covol of its operational decisions, including its decision to upgrade the Wash Plant and its decisions regarding how to best manage the selenium problem.  Covol's claims also fail because: (1) Covol cannot establish that Pinnacle owed Covol any legal duty to disclose those decisions to Covol, a required element of both of Covol's tort claims under West Virginia law; (2) Covol bases its tort claims on statements of future intention, which cannot form the basis of a fraud claim; (3) Covol has failed to identify any specific false statement made

by Pinnacle; (4) Covol has no evidence of any intent to deceive on Pinnacle's part; and, finally, (5) Covol cannot demonstrate any reasonable reliance on any alleged statement by Pinnacle.

# ARGUMENT

## I.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO PINNACLE ON COVOL'S BREACH OF CONTRACT CLAIM.

Covol claims on this appeal that the CPRRA imposes a duty on Pinnacle to lower the water level in the Impoundment for Covol's benefit, despite the fact that the words "water level" appear nowhere in the CPRRA.  The upshot of Covol's argument on this appeal is that the CPRRA, a fully integrated and unambiguous contract, negotiated between sophisticated corporate parties with the advice of counsel,  should be interpreted to grant Covol rights of access that appear nowhere within the four corners of the contract.  As a matter of law, however, the CPRRA must be limited to its freely-negotiated, unambiguous terms, which provide no support for Covol's claim.

While the purported basis for Covol's breach of contract claim has varied over the course of this litigation, one thing remained constant:  Covol's claim that the CPRRA required Pinnacle to lower the water level in the Impoundment upon Covol's request is not based on any express obligation in the contract.  Covol's claim first relied on a theory, now abandoned, that the CPRRA granted it certain unspecified, common law rights of access.[19]  The District Court

_____

[19] As explained by the District Court, Covol abandoned that claim below because it was "absent from Covol's response" at summary judgment. (Order at 19 & n.20[JA2879]). The argument is also absent from Covol's brief.  Undoubtedly, this

correctly rejected Covol's common law access claims, holding that it "will not create or impose an additional duty or right that is not expressed by the plain language of the parties' unambiguous and fully integrated contract" and citing to the freely-negotiated integration clause in the CPRRA. (Opinion, p. 20[JA2880]; CPRRA §28[JA89-90]).

Covol's access rights are governed solely by the CPRRA. The CPRRA provides Covol with specified and limited rights of access in connection with its coal recovery operation. Further, it is beyond dispute that Pinnacle has never done anything to compromise those rights of access. The CPRRA cannot be judicially amended by Covol's *post-hoc* wishful thinking, as such a result would be directly contrary to West Virginia law. *See Fifth Third Bank*, 724 F. Supp. 2d at 605-606; *Cotiga Dev. Co. v. United Fuel Gas Co.*, 128 S.E.2d 626, 631 (1962) ("When the language of a written instrument is plain and free from ambiguity, a court must give effect to the intent of the parties *as expressed in the language employed* . . . .") (emphasis added).

---

is because the law of mining does not recognize such rights in this context. Instead, courts interpret agreements like the CPRRA to be licenses to mine that do not create any interest in land that could give rise to implied rights of access. *Gilberton Coal Co. v. Shuster*, 403 Pa. 226, 229 (Pa. 1961).

A. **The District Court Correctly Held That the CPRRA is Unambiguous and Does Not Obligate Pinnacle to Lower the Water Level.**

As the District Court properly held, Covol cannot identify any provision in the CPRRA that obligates Pinnacle to lower the water level in the Impoundment so as to affirmatively provide easier access to the refuse material. In order to prove a breach of contract, Covol must point to an express duty or obligation under the CPRRA that Pinnacle violated. *See Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc*., 681 F. Supp. 2d 694, 714 (S.D. W. Va. 2009) (citing 23 Williston on Contracts §63:1). Any breach of contract claim that is not based on the "parties' agreement" fails as a matter of law because the contract terms "furnish[] the law which governs the[]" parties. *Fifth Third*, 724 F. Supp. 2d 598, 606 (S.D. W. Va. 2010) (citing *Rollyson v. Jordan*, 518 S.E.2d 372, 376 (W. Va. 1999)).

1. **The District Court Correctly Held that the CPRRA is Unambiguous.**

The District Court began its analysis of Covol's breach of contract claim by correctly determining that the CPRRA is an unambiguous contract:

> [T]he language of the CPRRA is clear and unambiguous. The terms are straightforward, understandable, and definitive. They are not susceptible to more than one reasonable interpretation. Further, the contract is the product of negotiations between sophisticated corporate parties, both represented by counsel. Therefore, the

27

Court will identify and enforce the plain and natural meaning of the language of the CPRRA.

(Order at 15[JA2875]). The Court also held that "'[e]xtrinsic evidence will not be admitted to explain or alter the terms' of the unambiguous CPRRA." (*Id.* at p. 20[JA2880], citing Syl. pt. 6, *Faith United Methodist Church and Cemetery of Terra Alta v. Morgan*, 745 S.E.2d 461 (W. Va. 2013)).

A contract is "unambiguous" when it is "susceptible to only one reasonable interpretation." *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 67 (2010); *see also Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (no writing is ambiguous unless it is "susceptible to two reasonable interpretations"). The "question as to whether a contract is ambiguous is a question of law to be determined by the court." *Berkeley County Public Service District v. Vitro Corporation of America*, 162 S.E.2d 189, 200 (1968); *Wood v. Acordia*, 618 S.E.2d 415, 420 (2005). Furthermore, a court's analysis on ambiguity determines whether "the contract is ambiguous or unambiguous on its face," without resort to any parol evidence. *Goodman*, 7 F.3d at 1126.

Here, Covol has never explained how any provision of the CPRRA may be susceptible to two reasonable interpretations. Covol simply asserts that because certain provisions of the CPRRA (*e.g.*, Section 4) are not unambiguously

in its favor,[20] then the CPRRA must be ambiguous.[21]  Covol's bald assertion is not

enough to demonstrate that an ambiguity exists, however, because the "mere fact

that parties do not agree to the construction of a contract does not render it

ambiguous." *Energy Development Corp. v. Moss*, 591 S.E.2d 135, 143 (W. Va.

2003).  As the District Court correctly held, Covol's erroneous claims about what

those provisions mean does not render them ambiguous or permit the admission of

---

[20] With respect to Section 4, Covol apparently relies on the fact that the word 'access' appears in the heading of that section. As the District Court held, Section 30 provides that "[h]eadings are used . . . for convenience of reference only and shall be given no weight" in interpreting the agreement.  (Order at 16[JA2876]). Clauses like Section 30 are fully enforceable and bar any attempt to use headings to imply duties that do not exist. *E.g.*, *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 953 N.E.2d 285, 290 (Ohio 2011).

[21] In making this argument, Covol appears to argue that because **one of its employees** claimed that he had conversations regarding water levels prior to the execution of the CPRRA, then that means that everyone knew that Covol intended to lower the water level and, thus, that Pinnacle must be obligated to do so under the CPRRA.  (Appellant's Brief at 43 (citing Turner 338:7-340:16[JA1549-51])). To the extent that Covol has attempted to claim that this testimony supports the existence of an ambiguity, Covol is mistaken.  Instead, if lowering the water level was so important to Covol, it should have obtained an obligation to lower it within the four corners of the contract. (Palmer 123-125[JA670-72]). And Covol's failure to obtain such a provision, in the face of the integration clause in Section 28 of the CPRRA, means that the obligation does not exist.  Moreover, Mr. Turner's position that Covol understood, prior to entering into the CPRRA, that controlling the water level was critical to its operation is belied by Covol's due diligence materials, which, like the CPRRA, contain no mention of water levels. (Ex.7F[JA2367-71]; Risher 130-131[JA2359-60]; Ex. 8F[JA2811-16]; Turner 170[JA2780]).  Finally, Mr. Turner's testimony in this regard failed to identify any statements with specificity and named employees of the prior owner of the Pinnacle Mine, PinnOak, and not Pinnacle.  The only Pinnacle employee that Covol asked about discussions regarding lowering the water levels stated that he did not recall having any. (Vetor 30-40[JA2850-60]).

extrinsic evidence in order to "interpret" the contract's plain meaning or "alter the terms of the unambiguous CPRRA." (Order at 20 [JA2880](citing Syl. pt. 6, *Faith United Methodist Church*, 745 S.E.2d 461)).[22]

### 2. The District Court Correctly Held that the CPRRA Does Not Obligate Pinnacle to Lower the Water in the Impoundment.

In Section 18 of the CPRRA, Pinnacle and Covol unambiguously established, with precise words of obligation, the limited duties that Pinnacle owed to Covol:

> Pinnacle hereby agrees to permit Covol to operate the Processing Facility for recovery of the Refuse Material at the Refuse Site. Pinnacle shall provide to Covol: (i) a mutually agreeable area in the immediate vicinity of each fines pond that is adequate for Covol to install and maintain its Processing Facility and equipment for recovery of Refuse Material; (ii) any right-of-way reasonably needed by Covol to transport the Refuse Material from the ponds to the processing plant; and (iii) ingress and egress over the property of Pinnacle or its

---

[22] Covol relies heavily upon the Rule 30(b)(6) deposition testimony of William Boor. (Appellant's Brief at 42-43)Covol fails to acknowledge that Mr. Boor repeatedly qualified his statements about access by explaining that Covol's access rights were "subject to the terms of [the CPRRA]." (Boor 69:1-7[JA1325]; 72:8-13[JA1327]; 77:25-78:12[JA1328-29] ("You know, access is defined here. We agreed to that access.")). In any event, Covol's argument with regard to Mr. Boor's testimony regarding his understanding of the CPRRA is *inadmissible* because Covol has no evidence to demonstrate that his understanding was ever expressed to Covol. For purposes of contract interpretation, "[a] party's internal, subjective intent is irrelevant[.]" *Cranbrook Investors, Ltd. v. Great Atl. Mgmt*, 201 F.3d 435, 1999 WL 0120534, *3 (4th Cir. 1999) (Table). The "key is the party's manifestation of intent," as demonstrated by its communications to the other party. *Id.* (citing *Lucy v. Zehmer*, 84 S.E.2d 516, 521 (1954)).

lessors to support the activities described in this Agreement.

This provision clearly does not apply to Covol's "water level" claim. Section 18 merely provides that Covol must have ingress and egress over Pinnacle's property, a right-of-way over the land from the Impoundment to the Processing Facility, and a mutually agreeable area for the facility. It is beyond dispute that Covol was never denied any of those. In fact, the only evidence on the subject demonstrates that Pinnacle worked closely with Covol to give effect to the access laid out in Section 18. (*See* O'Bryan 73[JA631]; 75-76[JA632-33]).

Covol does not claim that Pinnacle violated the specific access rights set forth in Section 18. Instead, Covol claims that Pinnacle breached the CPRRA because it did not lower the water level at Covol's demand and thereby denied Covol access to the refuse material in the Impoundment by allegedly not making it easier for Covol to reach the material. The CPRRA, however, does not obligate Pinnacle to control the water level for Covol's benefit; it also did not grant Covol any right to demand that Pinnacle raise or lower the water level.[23] Indeed, the

---

[23] The main architect of Covol's coal refuse recovery operation confirmed at his deposition that the CPRRA does not mention water levels, and he explained that if any such right were conveyed, it would have been provided for in one of the contracts between the parties. Turner 250:2-8[JA1103] ("The specific details of how we pump water back and forth were not addressed in the contracts, yes."); *id.* 189: 10-21[JA1102] ("[T]here were … three main documents, and if it was part of the deal, it would have been in our total documents that we used."); *see also* Palmer 123:12-125:5[JA670-72].

Court may search the CPRRA in vain for any reference whatsoever to the level of the water in the Impoundment. There is none.

In fact, Covol's position is contradicted by the express terms of the CPRRA. Rather than ensuring the quality, amount, or accessibility of the refuse material in the Impoundment, Pinnacle ***expressly disclaimed*** "ANY WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE REFUSE MATERIAL." (CPRRA, §20[JA85-86], emphasis in original). Section 20 disclaims any "representation as to the ***character or quality or amount*** of the Refuse Material Covol removes or receives," and, even more importantly, disclaims any warranty regarding the "***suitability of Pinnacle's premises***" for the refuse recovery operation contemplated by the CPRRA. (*Id.*) (emphasis added).

Further, Section 4 of the CPRRA expressly puts the onus on Covol to mine and process material "***at its own expense***" and in a way that does not "interfere with Pinnacle's Mining Operations." (emphasis added). Indeed, as Covol strenuously argues throughout its brief, it was ***solely Covol's*** obligation to recover the refuse material from the Impoundment, and the question of how to recover that material was up to Covol, not Pinnacle, consistent with the terms of the CPRRA.[24] That is exactly why Covol considered purchasing a "larger dredge

_____

[24] Thus, Pinnacle's rights with respect to the Impoundment, which is a key part of Pinnacle's overall mining operations, were superior to Covol's rights under the express terms of the contract. (CPRRA, §4[JA77]). Notably, the CPRRA does not

with a longer reach," which would have allowed Covol to mine deeper into the pond regardless of water levels.[25]  Covol's obligations in Section 4 cannot impose additional duties on Pinnacle not otherwise found in the contract.

## B.  The District Court Correctly Held That the Parties' Permits Are Not Incorporated By Reference Through Section 8 of the CPRRA.

The District Court also correctly held that Section 8 does not incorporate into the CPRRA whatever obligations that Covol erroneously believes the parties' permits and MSHA plans created.  At best, Section 8 makes nothing more than an "oblique reference to a separate, non-contemporaneous document," which is insufficient under West Virginia law to incorporate the permits into the

---

have a reciprocal provision saying that Pinnacle shall not in any way interfere with Covol's operations at the Impoundment. Furthermore, Section 10 of the CPRRA says that "Covol shall conduct all of its operations hereunder in such manner as to reasonably do the least possible damage to Pinnacle's premises." These provisions, of course, also mean that Covol cannot ask Pinnacle to take actions on its behalf which would injure or interfere with Pinnacle's operations, such as interfering with Pinnacle's selenium control program.

[25] *See* Ballard 301-303[JA163-65], Df.Ex. 6R[JA307]; Palmer 68:13-17[JA668]; Turner 326-328[JA1118-20]; Shaal 135[JA857]. In its Complaint, Covol sought damages for "its share of the more than $100,000,000 in high-grade coal" that it alleged existed in the Impoundment. (Compl, ¶39[JA24]). Setting aside the fact that Covol's own internal memorandum referred to the larger dredge as the "solution"  (which would have cost around $1 million) to its water level issue, (Ballard 301-303[JA163-65], Df. Ex. 6R[JA307]; Palmer 666-668[JA240-242]), another witness, Barry Dangerfield, testified that, as an engineer, he could think of other ways to get at the fines that would not require the imposition of an extra-contractual duty on Pinnacle to lower the water level in the Impoundment. (Dangerfield 3-19[JA2150-66]; 108:18-109:3[JA2167-68]).   Covol provided no credible evidence to the contrary.

parties' agreement.  (Order at 18[JA2878] (citing *State ex rel. U-Haul Co. of West Virginia v. Zakaib*, 752 S.E.2d 586, 595 (W. Va. 2013)).

Just last year, the West Virginia Supreme Court of Appeals held that incorporation by reference is appropriate only where the following three elements are met:  "(1) the writing must make a clear reference to the other document so that the parties' assent to the reference is unmistakable; (2) the writing must describe the other document in such terms that its identity may be ascertained beyond doubt; and (3) it must be certain that the parties to the agreement had knowledge of and assented to the incorporated document so that the incorporation will not result in surprise or hardship."  *U-Haul*, 752 S.E.2d at 598.  Moreover, "a general reference in one writing to another document is not sufficient to incorporate that other document into a final agreement."  *Id.*

In *U-Haul*, the Supreme Court of Appeals of West Virginia concluded "that U–Haul was unsuccessful in its attempts to incorporate" a briefly mentioned addendum, which contained an arbitration clause, into its rental contract with its customers.  *Id.*  Similarly, Section 8, as the District Court properly found, "does not make a detailed reference to any plan or permit identification number," even though those numbers were readily available to the parties when they executed the CPRRA, and, indeed, "there is no addendum attached which would otherwise

34

indicate which permit or plan the CPRRA is incorporating by reference." (Order at 18[JA2878]).[26]

> Section 8 provides:
>
> > Covol shall obtain and maintain in full force and effect at all times while this Agreement is in force the necessary licenses and permits required by any governmental authority for the construction and operation of the Processing Facility and the conduct of its processing and Refuse Material removal operations and performance of the work pursuant to this Agreement before commencing the construction or such operations. Pinnacle **shall maintain its existing permits** that are required for its performance under this Agreement. Any additional permits required by Pinnacle for Covol's operations under this Agreement **shall be acquired by Pinnacle** provided that Covol shall pay any and all costs and fees reasonably associated with their acquisition. Covol shall comply fully with the provisions of all such licenses and permits.

(CPRRA, §8[JA79-80] (emphasis added)). Section 8 contains no language incorporating the terms of the permits and, instead, makes barely an "oblique reference" to them.[27] Moreover, Section 8 **makes no mention whatsoever** of any

---

[26] *See also* Townsend 30(b)(6) 21:16-23:9[JA2405-07], Ex. 140[JA2417-22]; Rau 83:7-84:4[JA2323-24], Ex. 9T[JA2340-42], 9U[JA2343-44].

[27] *See, e.g.*, *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1346 (Fed. Cir. 2008) (a document not identified "explicitly. . . by title or date, . . in a . . . clear, precise manner" is not incorporated by reference). Moreover, "a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Shanks v. Wilson*, 86 F. Supp. 789, 795 (S.D. W. Va. 1949). Here, the reference to permits is for the sole purpose of ensuring that Covol could lawfully conduct its operations.

mining *plans*. For these reasons, Section 8 does not incorporate by reference the parties' permits or plans.

In *U-Haul*, the court found "most troubling" the fact that the addendum in question was available to U-Haul's customers *only after* they signed the rental contract. 752 S.E.2d at 598.  Here, Covol claims that its permit modifications, which it sought for its Six-Phase Plan, and went into effect *after* the parties executed the CPRRA, are incorporated by reference into the CPRRA.  That is, Covol claims that a document that did not exist at the time of contracting was nonetheless incorporated by reference into the parties' agreement.  Just as the customers in *U-Haul* could not be said to have assented to the terms of an addendum that they had never seen when they signed their rental agreements, Pinnacle cannot be bound by the terms of a plan modification that it also had never seen before it executed the CPRRA.[28]

Furthermore, while Section 8 does impose certain limited duties on Pinnacle, it does not evidence any intent by Pinnacle to be contractually bound by the specific terms of the parties' permits and plans.  Instead, Section 8 requires Pinnacle only to "maintain its existing permits that are required for its

---

[28] Covol argues that it would be "burdensome" to require the parties to "amend the terms of the CPRRA . . . each time the plan was modified." (Appellant's Brief at 39-40).  But they could have expressly agreed to be bound by, for example, "any subsequent modification" of the parties' permits. There is no such language in Section 8 or anywhere else in the CPRRA.

performance" and to acquire any "additional permits required by Pinnacle for Covol's operations . . . ."[29]  To prove a breach of either of those obligations, it would not be necessary to look at the language of the permits; rather, Pinnacle would only breach that clause if it failed to maintain its existing permits or to obtain the permits or modifications "required for Covol's operations." (*Id.*). Covol has no evidence (or claims) of either.

Finally, Covol's argument that the permits themselves could create binding contractual obligations on Pinnacle to lower the water level upon Covol's demand has no basis in the law.  A mining permit or an MSHA plan does not create contractual rights in favor of the parties to it.  To the contrary, MSHA Plans, which are governed by the Federal Mine Safety and Health Act, are required by MSHA to give effect to the purpose of the Act: "to protect the health and safety of the nation's coal or other miners."  *See* 30 U.S.C. §801(g).  Thus, the MSHA plans set forth what Covol is allowed to do from a safety perspective in the Impoundment; they do not impose binding obligations on Pinnacle to support Covol's operations simply because Pinnacle is the holder of the permit.[30]  Indeed,

---

[29] *See* Townsend 30(b)(6) 59:14-61:11[JA2408-10].

[30] Consistent with that provision of the MSHA Act, Gina Rau, one of Covol's 30(b)(6) representatives, confirmed that the purpose of an MSHA plan submission, just like a permit with the WVDEP, is to demonstrate that a mine will operate "in a safe fashion."  (Rau 41:21-42:2[JA2316-17]; *id.* 42-45[JA2317-20]).  The approved plan dictates the terms under which Covol's operation *could* proceed as a matter of safety for its workers.

the safety standards promulgated under MSHA's regulatory scheme "afford[] no private cause of action." *Browning v. Geupel Const. Co.*, 891 F. Supp. 275, 278 (S.D. W. Va. 1995).[31]  Therefore, Covol's attempt to assert a "state-law" breach of contract action based on an alleged violation of such a plan is baseless. *King v. Island Creek Coal Co.*, 339 F. Supp. 2d 735, 741 (W.D. Va. 2004).[32]

### C.    The District Court Correctly Declined to Create Any Implied Rights for Covol or to Impose Implied Obligations on Pinnacle.

After erroneously asserting that the CPRRA is ambiguous, without even explaining how any of the provisions of the CPRRA are susceptible to two reasonable interpretations, Covol asks this Court to create rights in its favor, ***solely by implication***, even though those rights are nowhere to be found in the words expressed by the parties in the CPRRA.

Where, as here, "the terms of a [contract] are plain and unambiguous, there is no room for interpretation" or to imply terms that do not exist within the

---

[31] No private right of action is necessary because MSHA itself "administratively enforce[s]" the limitations in MSHA plans through citations. *King v. Island Creek Coal Co.*, 339 F. Supp. 2d 735, 741 (W.D. Va. 2004). And, while Covol repeatedly asserts—with no support—that Pinnacle "violated" the MSHA plan and/or the WVDEP permit due to its inability to lower the water level in the Impoundment, the record is devoid of any evidence of MSHA or WVDEP citations based on those alleged failures to lower the water level.  (Townsend 30(b)(6) 63-65[JA2412-14]).

[32] Covol relies on language buried in an Addendum to the MSHA plan. (*See* Townsend 30(b)(6), 69-70[JA2415-16]; Pl. Ex. 144[JA2423-2608], Addendum in Appendix III at COV057860[JA2485-87]). That Addendum was "[d]eveloped by Covol Fuels No. 4, LLC." (*Id.*). While it mentions lowering the pool level in the context of Covol's planned dredging procedures, (*id.* at COV 057861, No. 7[JA2486]), it does not impose any obligation on Pinnacle to lower the pool level.

38

four corners of the contract. *See* WILLISTON ON CONTRACTS §30:4 (2012). That is why, when faced with an unambiguous contract, like the CPRRA here, courts in West Virginia will "decline to imply [an affirmative] duty where none is established or intended by" the plain language used in the parties' contract. *See Fifth Third*, 724 F. Supp. 2d at 605. Here, the District Court correctly held that the parties knew, when drafting the CPRRA, "how to use clear language to establish affirmative duties and did so when such duties were intended." Indeed, "in light of the clear language of obligation" in Section 18, this Court should reject Covol's invitation, as the District Court did, to create a duty to lower the water level that has no support in the unambiguous CPRRA. *See id.* [33]

Simply stated, a court may not "use . . . testimony to add terms" or duties that are not found in the four corners of an unambiguous contract. *Id.* (citing *Fifth Third*, 724 F. Supp.2d at 606).[34] Furthermore, when considering all of the

---

[33] It should be noted that Covol's request, contrary to the CPRRA's integration clause and the parol evidence rule, that the Court rewrite the CPRRA to impose a duty on Pinnacle to lower the water level is by no means a simple one. Covol's request would require the Court to draft a contractual provision governing water levels that would have to account for procedural details, such as how often and how much Pinnacle would be required to lower the water, what notice would be necessary, and what exceptions Pinnacle could make based on its own needs. Had the parties intended to bind themselves to such a scheme, surely they would have included it in the CPRRA's terms.

[34] As noted above, coal states have already determined when implied rights of access may be found, and the contract at issue in this case—a bare license to mine in the Impoundment—does not carry with it any implied rights of access. *Gilberton Coal*, 403 Pa. at 229. Indeed, the CPRRA does not convey a coal estate

express provisions within the four corners of the contract-- including Sections 4, 8, 20, and 28—it is obvious that Covol's alleged implied right would in fact be inconsistent with those express terms. *Cf. Fifth Third*, 724 F. Supp. 2d at 606 ("review[ing] the agreement as a whole" to determine whether to imply a duty that was absent from an ambiguous contract).

       Finally, as the District Court correctly held, even assuming the CPRRA could be interpreted to provide Covol a right of access to the refuse material, Pinnacle did not breach the CPRRA. (Order at 20[JA2880]). Instead, all that Covol can hope to prove is that Pinnacle's reasonable business decisions made Covol's operation more difficult, but that alone cannot demonstrate that Pinnacle breached the CPRRA. Covol had other options available to it for accessing the refuse material in the Impoundment. *See supra* note 25. Covol therefore *was never denied access* to the refuse material; it simply had to change its operation, as Pinnacle was forced to do, in response to the selenium problem.[35] Moreover, it

---

to Covol and therefore conveys no implied rights of access. *Fisher v. W. Virginia Coal & Transp. Co.*, 73 S.E.2d 633, 639 (1952).

[35] As the District Court explained: "When Pinnacle upgraded the wash plant and changed the water management system, these actions undoubtedly made it more difficult for Covol to access the refuse material and thereby profit from operating the processing plant. However, Covol was never denied *access* to the refuse material. Covol simply had to deal with more water in the impoundment where the refuse material was located . . . . Pinnacle may have made business decisions that ultimately made Covol's operations more difficult, but no evidence indicates that Pinnacle breached the CPRRA." (*Id.* at 20-21[JA2880-81]). Moreover, it is incorrect to assert that Pinnacle's water management system prevented Covol from

40

was well within Pinnacle's purview to decide which option was the most viable, given the enormous risk to the environment and the company if a particular option did not work.

### D. The District Court Correctly Held that the Covenant of Good Faith and Fair Dealing Cannot Give Covol Rights That Are Inconsistent with the Plain Language of the CPRRA.

As a matter of contract law, the "implied covenant of good faith and fair dealing cannot give contracting parties rights which are inconsistent with those [expressly] set out in the contract." *See Barn–Chestnut, Inc.* at 509 (W. Va.1995). Contrary to Covol's argument here, the implied covenant of good faith and fair dealing does not provide a cause of action independent from a party's claim for breach of contract or to add duties not found in the contract. *Highmark W.Va. Inc. v. Jamie*, 655 S.E.2d 509, 514 (W. Va. 2007).[36] Covol fails to acknowledge either of these principles in its brief, likely because Covol knows that they are fatal to its claim. Instead, Covol relies almost entirely upon case law from outside West

---

operating. Rather, "they operated quite a while under that scenario." (Flegel 95-96[JA2190-91]).

[36] The "West Virginia Supreme Court of Appeals has . . . declined to recognize an independent claim for a breach of the common law duty of good faith, and has instead held that such a claim sounds in breach of contract." *Corder v. Countrywide Home Loans, Inc.,* No. 2:10–cv–0738, 2011 WL 289343, at *3 (S.D. W. Va. Jan. 26, 2011) (quoting *Doyle v. Fleetwood Homes of Va.,* 650 F. Supp. 2d 535, 541 (S.D.W.Va.2009)). As the Southern District of West Virginia has explained, "the doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a spate duty of fairness and reasonableness which can be independently breached." *Doyle*, 650 F. Supp. 2d at 539.

Virginia, attempting to support its position that the covenant of good faith and fair dealing can be used to "fill in the gaps" in the parties' contract – or, in this case, to grant Covol contractual rights that are not contained within and even conflict with the plain language of the CPRRA. Covol's argument is meritless.

Covol cites a case from the Third Circuit, *Fields v. Thompson Printing Co.*, 363 F.3d 259, 271-72 (3d Cir. 2004) several times, claiming that the *Fields* court rejected Fields's argument that the implied covenant of good faith and fair dealing cannot override the express terms of a written agreement.[37] The *Fields* court, however, held exactly the opposite. Indeed, the *Fields* court held, consistent with the holdings of the District Court in this case (and the common law of contracts) that the "implied duty of good faith and fair dealing does not operate to alter the clear terms of an agreement . . ." *Id.* at 264. In fact, the *Fields* court's holding is instructive in explaining the fallacy of Covol's position here.

Fields sued his former employer to recoup benefits under his employment contract after his employer, Thompson Printing Company ("TPC"), terminated him and refused to pay him the benefits to which he was entitled under

---

[37] See Appellant's Brief at 45 (claiming that the *Fields* court "reject[ed] Fields' defense that the only affirmative obligation that he had under the agreement was expressly contained in the agreement."). The remainder of Covol's citations do not support its proposition either and, tellingly, the majority of those cases are from foreign jurisdictions. *See Story v. City of Bozeman*, 242 Mont. 436 (1990); *Aventa Learning Inc v. K12, Inc.*, 830 F. Supp. 2d 1083 (W.D. Wash. 2011); *Guin v. Ha*, 591 P.2d 1281, 1291 (Alaska 1979); *Kooleraire Serv. & installation Corp v. Bd of Ed. of City of New York*, 28 N.Y.2d 101 (N.Y. Sup. Ct. 1971).

the plain terms of a non-forfeiture clause. *Id.* at 263. TPC argued that, because Fields had sexually harassed several female employees, it had no choice but to terminate Fields and, thus, Fields had deprived TPC of the benefits of its bargain – *i.e.*, that Fields would be a faithful employee – and therefore breached the covenant of good faith and fair dealing. *Id.* The Third Circuit, however, rejected TPC's plea that the court "save it from its own failure to include. . . a forfeiture clause," explaining that "[h]ad TPC intended to avoid this result, they could have bargained for a limiting provision in the contract." *Id.* at 269-270.

This Court should also reject Covol's plea that the Court save it from its own failure to obtain the right to demand that Pinnacle raise and lower the water level in the Impoundment for Covol's benefit because such a right would be inconsistent with the CPRRA as a whole, including, specifically, Section 20 and the other provisions noted above. In Section 20, Pinnacle expressly disclaimed any warranty as to the suitability of its premises for Covol's refuse recovery operation. That provision decimates Covol's claim that the CPRRA came with a promise by Pinnacle to affirmatively make the Impoundment more suitable for its operation by lowering the water level in the Impoundment upon Covol's request. Indeed, Covol, like TPC in the *Fields* case, cannot use the implied covenant of good faith

43

and fair dealing to override the express terms of the parties' contract in order to avoid the result of its bad bargain.[38]

Finally, as the District Court held, there is "no genuine dispute of material fact concerning whether Pinnacle met the standard of reasonable fair dealing when managing the selenium pollution issue." (Order at 20[JA2880]). Ultimately, Covol cannot hope to prove that Pinnacle, merely by exercising its business judgment in implementing a water recycling plan for managing selenium pollution, acted in bad faith.

## II.    THE COURT PROPERLY GRANTED SUMMARY JUDGMENT TO PINNACLE ON COVOL'S TORT CLAIMS.

Covol's tort claims are barred by West Virginia's gist of the action doctrine; are legally deficient as to crucial elements of the torts; and have insufficient factual support in the record that could create a genuine issue of material fact.

---

[38] To the extent that Covol's claim is that Pinnacle made its performance under the CPRRA difficult and thereby frustrated the purpose of the CPRRA, Covol has no cause of action absent some evidence that Pinnacle acted willfully or wantonly. "Frustration of purpose is an excuse for non-performance, not a cause of action." *Far W. Fed. Bank, S.B. v. Office of Thrift Supervision-Dir.*, 119 F.3d 1358, 1364 (9th Cir. 1997) (citing Restatement (Second) of Contracts §265); *see also Sinclair v. U.S.*, 56 Fed. Cl. 270, 281 (Fed. Cl. 2003) (frustration of purpose is not a valid claim). Moreover, the record in this case makes clear that, far from intentionally thwarting Covol's operation, Pinnacle did everything it could to help Covol succeed because Pinnacle received a portion of the revenue resulting from sales of coal processed by Covol. (*See* O'Bryan 71[JA630]; 76-77[JA633-34]).

### A.   Covol's Tort Claims are Barred by the Gist of the Action Doctrine.

As Covol concedes, under West Virginia's gist of the action doctrine, "whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract." *Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP*, 746 S.E.2d 568, 577 (W. Va. 2013).  A "tort claim arising from a breach of contract may be pursued only if the action in tort would arise independent of the existence of the contract." *Gaddy*, 746 S.E.2d at 577.  This means that "[r]ecovery in tort will be barred . . . when the alleged duties breached were grounded in the contract itself." *Id.*; *see also Silk v. Flat Top. Constr., Inc.*, 453 S.E.2d 356, 360 (W. Va. 1994) ("Tort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.").[39]

Covol claims that the CPRRA required Pinnacle to lower the water level in the Impoundment for its benefit but says that, if the CPRRA does not provide for that right, then it may use its "alternative" tort claims to enforce that purported contract right. That is what the West Virginia gist of the action doctrine prohibits: a tort claim based on the assertion that alleged contractual requirements were not fulfilled.

---

[39] *See also McClure v. Elmo Greer & Sons of Kentucky, LLC*, 369 F. Supp. 2d 832, 838 (N.D. W. Va. 2005); *Nat'l Steel Erection, Inc. v. J.A. Jones Constr. Co.*, 899 F. Supp. 268, 274 (N.D. W. Va. 1995).

The purported primary basis for Covol's fraudulent concealment and negligent misrepresentation claims is that Pinnacle allegedly promised that it would or that it could lower the water level in the Impoundment.  But, as the District Court held, all of Pinnacle's obligations to Covol with respect to the Impoundment were set out in the unambiguous CPRRA, and, therefore, Covol's claims could "not arise independent of the existence of the CPRRA." (Order at 26[JA2886]).  Specifically, there is no obligation regarding water levels in the fully-integrated CPRRA, and the gist of the action doctrine bars Covol's attempt to turn such an obligation into a tort duty.  *See Gaddy*, 746 S.E.2d at 577.

In holding that Covol's tort claims are barred by West Virginia's gist of the action doctrine, the District Court went so far as to address Covol's belated assertion that Pinnacle should be "liable for failing to disclose its plans to upgrade its wash plant" before the parties entered into the CPRRA.  (Order at 26[JA2886]). The District Court found that Covol's argument was essentially a claim for fraudulent inducement, although Covol failed to allege such a claim in its Complaint.[40] The District Court properly found that this claim, too, was barred by

---

[40] The District Court had no obligation to consider that claim, of course, because a party may not use its opposition brief at summary judgment to constructively amend its complaint. *Harris v. Reston Hosp. Center, LLC,* 523 Fed. Appx. 938 (4th Cir. 2013).  The court nonetheless analyzed Covol's claim and rejected it. This Court should simply reject this claim as untimely.

the gist of the action doctrine and that, in any event, the claim lacked any support in the record.[41]

Covol's claim regarding the Wash Plant upgrade is barred by the gist of the action doctrine because that doctrine bars claims for "fraudulent inducement to enter into . . . a contract where the false representation concerned duties later enshrined in the contract . . ." *Vives v. Rodriguez*, 849 F. Supp. 2d 507, 517 (E.D. Pa. 2012) (applying Pennsylvania law).[42]  Where "the precontractual statements that are the basis for the fraudulent inducement claim concern specific duties that the parties later outlined in the . . . contract, courts have repeatedly dismissed such

---

[41] Under West Virginia law, a fraudulent inducement claim requires, at a minimum, that Covol prove that Pinnacle made a "false representation" that "induced" Covol to enter into the CPRRA.  *See Folio v. Clarksburg*, 655 S.E.2d 143, 150.  The District Court rejected Covol's argument that "failing to disclose general plans to upgrade the wash plant constitutes a false representation," explaining that Covol produced no evidence to demonstrate that "it inquired about the wash plant or any plans to upgrade it or that Pinnacle actively concealed plans from Covol during due diligence or the execution of the CPRRA."  (Order at 26[JA2886]).  If Covol is allowed to resurrect this claim in its brief, the District Court's holding should be affirmed for this reason and the additional reasons discussed below.

[42] Pennsylvania law on the gist of the action doctrine is persuasive authority here because, in adopting and defining the doctrine for purposes of West Virginia law, the West Virginia Supreme Court of Appeals adopted the formulations of the doctrine under existing Pennsylvania case law. *See Gaddy*, 746 S.E.2d at 577 (citing, *inter alia*, *Star v. Rosenthal*, 884 F. Supp. 2d 319, 328-29 (E.D. Pa. 2012)).

claims as sounding in contract and, thus, barred by the gist of the action doctrine." *Id.* at 518-519. [43]

Here, Covol's main complaint regarding the upgrade is that it reduced the quality of the waste from Pinnacle's plant. (*E.g.*, Compl. ¶42[JA25]). But in Section 20 of the CPRRA, Pinnacle expressly disclaimed any warranty regarding the "quantity or quality" of the refuse material and regarding whether Pinnacle's premises would even be suitable for the refuse operations. Even assuming that Pinnacle failed to make some precontractual statement regarding its plans to renovate its Wash Plant—which Pinnacle was not required to do—Section 20 disclaims any duty to ensure that the refuse material would be of a certain quality and quantity and therefore bars Covol's claim pursuant to the gist of the action doctrine.[44] Indeed, that section renders any purported reliance on such statements

---

[43] The gist of the action doctrine asks, "What's this case really about?' The doctrine deals less with specific enumerated 'duties' than with the parties' conduct as it relates to the contract and the tort alleged." *Pediatrix Screening, Inc. v. TeleChem Int'l, Inc.*, 602 F.3d 541, 550 (3d Cir. 2010).

[44] Covol's claim also fails because it has insufficient evidence to create a genuine issue of material fact as to its allegation that Pinnacle had a "plan" to renovate its Wash Plant in 2008 when the CPRRA was signed. Barry O'Bryan, the manager of Pinnacle's Wash Plant, repeatedly explained at his deposition that, despite his desire to upgrade the plant as early as 1997 (when he was employed by U.S. Steel), as "[c]oal preparation managers always want" to do, "it didn't happen," until 2010. (O'Bryan 109-110[JA2272-73], 122[JA2276]). Covol ignores crucial follow up testimony from Mr. O'Bryan that, even though equipment in the Wash Plant could have been replaced, he "never got the right people to say yes to the upgrade" and an upgrade didn't happen for years. (O'Bryan 109-111[JA2272-74]). In addition, during discovery, Covol asked only one witness, Barry Dangerfield, whether the

regarding Pinnacle's supposed plans for its Wash Plant—a required element of Covol's claim—unreasonable as a matter of law.

All of Covol's tort claims are barred by the express terms of the CPRRA (and therefore the gist of the action doctrine) because Pinnacle expressly disclaimed any representation or warranty regarding the suitability of the premises for Covol's operation and Covol expressly "accept[ed] the risks" associated with operating in the Impoundment. (CPRRA, §20). The result here – that Covol's operation proved to be ill-suited to Pinnacle's Impoundment and that Covol unilaterally terminated the CPRRA – was expressly contemplated by Section 12 of the CPRRA, under which Covol had the unilateral right to, "in its reasonable discretion, terminate [the CPRRA] if Covol reasonably determine[d] that it [was] not economically feasible to continue" its refuse recovery operation. That is exactly what Covol did here, consistent with the parties' understanding under the CPRRA.[45]

---

Wash Plant upgrade was under consideration when Covol purchased and renovated the Processing Facility in 2008, and he answered that he had no knowledge of any such plans in place at that time. (Dangerfield 122-124[JA2169-71]). It is undisputed that the Cliffs Natural Resources Board of Directors did not approve Pinnacle's proposed Wash Plant upgrades until November of 2009. (Vetor 64:2-15[JA2835]; Pl. Ex. 35[JA2837-45]). Until approval by the Board, there was nothing to disclose.

[45] Likewise, as to Covol's water level claims, the CPRRA addresses Covol's access rights and disclaims any warranty from Pinnacle as to the suitability of the Impoundment for Covol's operations. That means that those claims are also barred by the gist of the action doctrine.

Finally, under its own "alternative claims" theory, Covol's tort claims could not arise independent of the parties' contractual relationship. Simply stated, Covol cannot, by suing for fraudulent concealment or negligent misrepresentation, "recover benefits it was unable to obtain in contract negotiations." *National Steel Erection, Inc.*, 899 F. Supp. at 274. This is particularly true here because the duties that Covol wishes to impose using its tort claims are directly contradicted by the terms of the CPRRA. Any obligation on Pinnacle's part to grant access to Covol or to disclose information to Covol or any right on Covol's part to demand information must be contained in the fully integrated CPRRA. No such obligation or right exists in the CPRRA.

**B.    Covol's Tort Claims Are Deficient for Additional Reasons.**

**1.    Covol Cannot Establish a Legal Duty to Disclose.**

Covol's tort claims fail because Covol cannot establish that Pinnacle owed it any legal duty to disclose. Under West Virginia law, "a successful claim for negligent misrepresentation would require a finding [of] a special relationship or duty" to the plaintiff. *Kidd v. Mull*, 215 W. Va. 151, 160, 595 S.E.2d 308, 317 (2004). Similarly, a plaintiff alleging fraudulent concealment must first establish "a fiduciary duty or other similar relation of trust and confidence that required disclosure." *Tully v. Tolley*, 63 Fed. App'x 108, 110-11 (4th Cir. 2003); *See also Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 991 F.2d 94, 98

50

(4th Cir. 1992).   Covol barely addresses this issue in its brief, and it has never identified any concrete facts from which such a duty could arise as to any of the alleged omissions and/or misrepresentations.[46]  For example, no duty to involve Covol in Pinnacle's decision making with respect to selenium management would make sense under the contracts, given that Pinnacle was solely responsible, under the CPRRA, to ensure compliance with all applicable state and federal laws. (CPRRA, §23[JA88]).   It was up to Pinnacle to determine how best to manage selenium, and it had no duty to inform Covol of its decisions in that regard. [47]

> **2.    Covol's Tort Claims Fail Because Covol Expressly Bases Those Claims on Statements of Future Intention and Because Covol Fails to Identify Any Specific Allegedly False Statement of Material Fact Made by Pinnacle or Evidence of Any Fraudulent Intent by Pinnacle.**

Covol cannot establish a misrepresentation claim based on alleged promises to lower the water level in the Impoundment, (*see* Appellant's Brief at

---

[46] Covol has repeatedly dodged this issue, seeking to convert its claims to claims for "common law fraud," arguing that it has alleged an actionable "suppression of the truth." (Appellant's Brief at 58 & n.50).  In its Complaint, however, Covol did not plead common law fraud. For that reason, Covol's argument regarding "common law fraud" should be disregarded. *Harris,* 523 Fed. Appx. at 938. Moreover, Covol's new theory relies entirely upon inapplicable federal *criminal* fraud cases. *See United States v. Gray*, 405 F.3d 227, 235 (4th Cir. 2005); *United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000).  Further, Fourth Circuit law is clear that suppression of the truth can only amount to actionable fraud where the defendant's conduct evinces "intent to deceive."  *Id.* at 899.

[47] This Court can "affirm the judgment below on any basis for which [it] find[s] support in the record." *Std. Aero, Inc. v. McDonough*, 1 F.3d 1234 (4th Cir. 1993) (Table); *see also Seremeth v. Bd. of Cty. Commrs. Frederick Cty.*, 673 F.3d 333, 338 n.2 (4th Cir. 2012).

58), even assuming they were made. As a matter of law, claims for fraudulent concealment or negligent misrepresentation cannot be based on "statements which are promissory in their nature, or constitute expressions of intention." *White v. Nat'l Steel Corp.*, 938 F.2d 474, 490 (4th Cir. 1991).[48]

In addition, Covol fails to point to any specific misstatement of fact made by Pinnacle to Covol to support its misrepresentation claim. Instead, it vaguely directs the Court to consider "Statement of Facts Sections 4-5." Clearly, at this late stage in the litigation, such a contention is woefully insufficient to support Covol's tort claims. Covol's failure to identify any specific, affirmative misstatement of material fact by Pinnacle upon which Covol alleges to have reasonably relied, is fatal to its supposed misrepresentation claim. *See*, *e.g.*, *Fifth Third*, 724 F. Supp. 2d at 610 (misrepresentation claims require an affirmative "false assertion" of fact).[49]

---

[48] To the extent that the claims are also based on the alleged failure to disclose plans regarding the Wash Plant, as shown by the discussion in note 44 *supra*, there is no factual basis for such a claim.

[49] Covol's reference to Sections 4-5 of its statement of facts suggests that its misrepresentation claims are based on Pinnacle's submission, as the permittee, of Covol's plan modifications to MSHA. Covol's claim seems to be that, by submitting Covol's Plan to MSHA, Pinnacle owed Covol a duty to review the plan to determine whether it would be effective. Otherwise, there could be no duty to inform Covol that Pinnacle would be unable to lower the water level. The gist of the action doctrine bars a tort claim like this one because "liability," if any, "arises solely from the contractual relationship," and "the alleged duties breached were grounded in the contract itself." *Gaddy Engineering*, 746 S.E.2d at 577. To

Moreover, Covol has also failed to offer, either to the District Court or to this Court, any evidence of fraudulent intent by Pinnacle to support a fraudulent concealment claim or inducement claim. To survive summary judgment, a plaintiff must set forth at least a quantum of admissible evidence that the defendant intended to deceive the plaintiff. *Core Commc'ns, Inc. v. Verizon Maryland LLC*, 744 F.3d 310, 324 (4th Cir. 2014) (affirming summary judgment because plaintiff "offered no evidence" of "any intent to defraud or deceive[.]"); *see also Tolley*, 63 Fed. App'x at 111 (affirming summary judgment because plaintiff had no evidence that the defendant took any "affirmative act" that was "designed to prevent" her from discovering the facts at issue).[50] As the District Court correctly found, Covol

---

Pinnacle's knowledge, no court has ever recognized a misrepresentation claim based upon statements made in a government permit.

The claim fails as a factual matter as well. Pinnacle made no representation of any kind to Covol by submitting Covol's plan modifications to MSHA. ***The plans*** upon which Covol relies here ***were not written by Pinnacle***: Beard Technologies and U.S. Steel commissioned the 2002 plan, and the 2008 Six-Phase Plan was commissioned by Covol. (Df. Ex. 9S[JA2334-39]; Rau 73-74[JA2321-22], 40-41[JA2315-16]; P. Ex. 140[JA2417-22]; Townsend 30(b)(6) 11[JA2404], 21[JA2405]). In addition, Pinnacle's ***submissions*** on Covol's behalf ***were made to MSHA***, not Covol. Moreover, when an applicant submits a plan to MSHA, it verifies only "that the design of the impounding structure is in accordance with current, prudent engineering practices for the maximum volume of water, sediment, or slurry which can be impounded therein . . . ." 30 C.F.R. §77.216–2(a)(17). (See D. Douglas Townsend 30(b)(6) Dep. 62:14-23[JA2411]). Pinnacle did not make any representation to Covol regarding whether its plans would work simply by submitting Covol's plans to MSHA.

[50] Mere silence, without intent to deceive, cannot establish a claim for fraudulent concealment. Indeed, "unlike fraud for affirmative misrepresentations, concealment requires a showing of intent to conceal a material fact; reckless

53

has failed to demonstrate any "active[] conceal[ment]" by Pinnacle. (Order at 26 [JA2886]).[51] Covol cannot prevail on its fraudulent concealment claim.

### 3. Covol's Tort Claims Fail Because Covol Did Not Rely Upon Any Alleged Misrepresentations.

Finally, Covol has not set forth sufficient evidence in the record to establish that it actually relied on any of the supposed misrepresentations alleged in its Complaint. In fact, it is undisputed that Covol chose to invest $4,000,000 on the Overburden Removal Project *after* Pinnacle disclosed the Wash Plant upgrade and after Covol was aware of the selenium management program. There is no evidence to the contrary that Covol invested money in reliance upon a misrepresented or concealed material fact.

Covol's claims for negligent misrepresentation and fraudulent concealment both rely upon vague assertions that Pinnacle failed to adequately inform Covol of its plans to "renovate the Pinnacle Wash Plant" and its decision to "modify its water management system," which, the record demonstrates, came as a

---

nondisclosure"—and, of course, negligent nondisclosure—are "not actionable." *Bank of Montreal*, 193 F.3d at 827.

[51] Covol has waived any right to appeal that factual determination by the District Court because it has failed to raise any argument regarding it in its opening brief. *See Perez*, 650 F.3d at 372.

result of Pinnacle's environmental obligations regarding selenium pollution.[52] (Compl. ¶¶42, 49[JA25, 26]).

However, on July 22, 2010, Darrell Turner, the main architect of Covol's coal recovery operations, e-mailed John Shaal, the then-Vice President of Coal Operations for Headwaters, and Bill Gehrmann, the then-President of Covol's coal division, explaining he had met with Pinnacle representatives regarding those very issues:

> [Pinnacle] is still working [on] Selenium issue – will get a draft copy of their internal engineering report to me.
>               . . .
>
> [Pinnacle] will have all of their preparation plant upgrades completed by JAN 2011.  This will cause significant problems for us we will need to address.  This means that we no longer will desire to process the tailings from their clarifier underflow and will need to reroute them to the back of the impoundment ([Pinnacle] agreed to this).

(Df. Ex. 8T[JA2817-18]; *see also* Turner 292-93[JA2784-85]; Gehrmann 174-75[JA2221-22]; Palmer 130-31[JA675-76]).[53]   As that un-contradicted email shows, Covol was well aware not only of the plan to upgrade but also of the effects that it might have on its operations.   Mr. Turner also acknowledged that the July

---

[52] *E.g.,* Shaal 147-48[JA858-59].  Pinnacle's changes to its water management system, which Covol alleges eliminated Pinnacle's ability to lower the water level, could not have been material, given that it is undisputed that Pinnacle could only lower the water level about "an inch per week" before the water management plan went into effect. (O'Bryan 164:4-22[JA644]).

[53] Mr. Turner was referring to Covol's practice of processing slurry recently expelled from the Wash Plant, rather than mining the preexisting refuse material in the Impoundment.  (O'Bryan 78:12-16[JA635]).

55

22, 2010 email demonstrates that Pinnacle kept him abreast of its decision-making regarding selenium management. (Turner 292:23-293:5[JA2784-85]).[54]

In August of 2010, Pinnacle shared the recommendations in the Barr report with Ms. Rau, Covol's permitting and compliance specialist. (Rau 151-155[JA758-62]; Df. Ex. 10E[JA813-18]). Ms. Rau's communications with her colleagues at Covol demonstrate that Covol was aware that Barr had recommended that Pinnacle "limit pumping" from the Impoundment and that such a limitation would directly impact Covol's operation. ([Df. Ex. 10E[JA813-18]). [55]

Moreover, when confronted with the July 22, 2010 email, Covol's president testified that he not only knew about the Wash Plant upgrade in July 2010, but that he *thereafter* authorized the Overburden Removal Project (the $4 million project that Covol claims it commissioned on the basis of Pinnacle's alleged concealment) *three months later*:

> Q.    [T]his e-mail was about three months before you approved the overburden removal project, correct?
>
> A.    Yeah, correct.

---

[54] Mr. Turner was not alone in that understanding. (*See* Palmer 130:22-131:1[JA675-76]).

[55] Covol created confusion at the District Court about whether it received both the draft and final Barr reports. But, as Exhibit 10E demonstrates, there is no dispute that Covol knew in August of 2010 that Pinnacle would limit pumping from the Impoundment to ensure compliance with selenium regulations and that they believed that such a change would negatively affect their operation.

> Q.    So you . . . approved the overburden removal project in October
>       2010 ***after hearing from Mr. Turner in July of 2010 that
>       Pinnacle planned to upgrade its prep plant***, correct?
>
> A.    Correct.

(Gehrmann Dep. 176:10-18[JA2223]) (emphasis added).

This evidence also demonstrates that Covol did not rely upon any statement or omission regarding Pinnacle's upgrade or selenium management decisions in expending the $4 million on the Overburden Removal Project.

## <u>CONCLUSION</u>

The District Court's order granting summary judgment to Pinnacle on all of Covol's claims should be affirmed and this Court should remand this case to the District Court for a determination of the attorney fees owed to Pinnacle as the prevailing party.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pinnacle respectfully requests that the Court permit oral argument.

Respectfully submitted,

*/s/*  Paul R. Harris
Joseph A. Castrodale (Ohio Bar #0021918)
Timothy J. Downing (Ohio Bar #0042396)
Paul R. Harris (Ohio Bar #0079538)
Matthew T. Wholey (Ohio Bar #0086550)
ULMER & BERNE LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
(216) 583-7000 / Fax:  (216) 583-7001
jcastrodale@ulmer.com
tdowning@ulmer.com
pharris@ulmer.com
mwholey@ulmer.com

Wm. Scott Wickline (W. Va. Bar No. 6100)
Christopher D. Pence (W. Va. Bar No 9095)
HARDY PENCE PLLC
500 Lee Street, East, Suite 701
Charleston, West Virginia 25329
(304) 345-7250 / Fax:  (304) 345-9941
scott@hardypence.com
cpence@hardypence.com

*Attorneys for Pinnacle Mining Company,*
*LLC*

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

this brief contains <u>13,993</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>*/s/* Paul R. Harris</u>
Paul R. Harris

*Counsel for Appellee*

Dated:  July 7, 2014

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on July 7, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Thomas V. Flaherty
tflaherty@fsblaw.com

James D. Gardner
jgardner@swlaw.com

*Counsel for Appellant*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Tracy Moore Stuckey
Tracy Moore Stuckey
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219